May it please the Court, my name is Jennifer Bonjean and I represent Mr. Norman, the defendant appellant in this matter. As this Court is certainly aware, Mr. Norman raises seven issues in his brief, some of them with overlapping legal principles. This morning I'd like to start by addressing the hearsay problems that occurred at Mr. Norman's trial and the related Sixth Amendment issues. And I will then turn to the question of the Court's jury instruction governing the testimony of cooperating co-defendants or accomplices. Unless the Court, this Court would like me to go anywhere else, I'd be happy to oblige. Over objection, the District Court admitted damning hearsay evidence that denied Mr. Norman a fair trial. The first bucket of hearsay was essentially these text messages that were sent from the deceased to his grandmother. I call them the Tim is after me texts or I know Tim's got people looking for me texts. That's one bit of hearsay. The second damning hearsay evidence was the testimony of Mr. Hill that relates to Chris Carroll's statements that were admitted as categories of hearsay evidence were so highly prejudicial in the context of this case because they were the most compelling, if not the only, evidence that went directly to the intent of Mr. Norman. So in the context of the case, you may say, okay, these don't seem like very important things in the context of all the evidence. But they truly were because they were the direct evidence of intent and they were unreliable, they were untrustworthy, and they were hearsay. So starting with the text Tim is after me texts, there is no question that the deceased's statements to his grandmother constituted hearsay. They were essentially statements from the grave, highly prejudicial. And the government contends that they should have been admitted, they were properly admitted under the then existing state of mind exception, Federal Rule of Evidence 8033. The government contends that they were at liberty to argue to the jury, and they did. That essentially, the victim is staying away from St. Louis, he's scared, he's scared that Tim has people after him, and he was right. That is telling the jury to rely on those statements for substantive purposes for the truth of the matter asserted. Therefore, constitutes hearsay. Now the question is, was it admissible nonetheless? And the question, the answer to that question is no. And that's because those statements came nine months prior to the events that are the subject of the indictment. Perhaps if Mr. Montgomery was shot, assaulted, kidnapped, any other type of crime that occurred contemporaneous with or in close proximity to the making of the statements, then the government might be on good footing with their argument. Counsel, doesn't it go to the unlikelihood of him consenting to, getting an insurance policy on himself for the defendant? Well Judge, that's an interesting question. I think it requires so much speculation because it is clear from the hearsay statements and in the context that they were made, that it really relates to him not wanting to answer questions or being fearful of answering questions around this burglary that he was suspected of committing at his grandmother's home. That is the context of the statements. So I think we're, we could speculate all day long and that's the problem because it wasn't made in any contemporaneous fashion to the events that underlie the indictment that we don't know. And that is the precise problem with hearsay evidence that is statements that are made nine months prior to an event. If you look at it, the government offered a couple of reasons why it should come in. They acknowledged that it was remote in time. They said, one, it's necessary to understand context of the case generally, right? And that argument essentially is an old rest just a argument, which of course we don't really do that anymore. And so that's you know, kind of suspect. But what they're saying is it's necessary to understand why he needed to be lured back to St. Louis, right? And so that explains part of the conspiracy and it's relevant to that point. Then they said that it's relevant as Judge Benton just acknowledged that whether or not he would have been willing to consent to an insurance policy taken out on him by Mr. Norman, right? Now it appears that the judge, the district judge gave credence to both theories and that he arrived at the conclusion that based on the totality of the circumstances that it's relevance under Rule 401 is more, well I guess he says, first of all he found it relevant under Rule 401, therefore admissible. So it's admissible hearsay. Because I think it can't be argued it's non-hearsay, right? I mean it is hearsay. It's whether it falls into an exception to the hearsay rule or not. The judge says falls into the exception. I actually said it's non-hearsay, but he was misstating what it is, right? But in any event, he said it's admissible hearsay and that he didn't find that it's relevance was outweighed by it's prejudice, right? That the probative value was sufficient to bear the prejudice. And we're reviewing that for a clear abuse of discretion, which is a very high standard. So what's your best argument that demonstrates the clear abuse of discretion and the subsequent prejudice, which you also need to show? Yes, great questions. And so I continue to come back to the fact that the evidence is of course hearsay, as I think we can all agree. The idea that it was necessary to show that he was lured back, I think is a red herring, and this is why. It's because there really was no theory that he was lured back. He came back on his own to go do some recording in a studio, unless the government was suggesting that his own grandmother was luring him back to be murdered as part of some murder for hire plan. Even the government has not alleged that. So it wasn't a matter, and it was again, much longer before this conspiracy went into motion. So it seems that the fact that we have to speculate so much about what was going on or why he was being asked to come back, which again, there's not even any foundation for the fact that this was at Mr. Norman's direction. It is clear from the context of the messages that it was Mr. Norman's grandmother that says, come talk to the police. I want you to submit to a polygraph. Because we are talking about a great deal of valuable items that are gone and intellectual property, and why are you running? I want you to come. And he does say I'm fearful, but we just don't know why and whether it's connected to any events that ultimately occurred. He is fearful because maybe he'll go to jail, maybe he'll get beat up, who knows? But that is the problem. And ultimately, in order for it to be relevant, it has to be relevant related to the charged events, not just some generalized fear. And under the 403 analysis that the court did, it is not particularly probative because it lacks foundation and it's unreliable. It is frankly, as we sit here today, we don't know why he made those statements and I think that on its face tells us that it could not be particularly probative. And therefore, the prejudicial effect was extreme given the fact that it really went to intent and was misused, misused to show the intent of the murder rather an intent to do something else. And that's where I think the heart of our argument lies. And then going into the next bucket of hearsay statements, these statements that were admitted through Mr. Hill's testimony, but these Chris Carroll statements that were admitted as non-hearsay statements of an alleged co-conspirator. And our position is that while the court certainly was at liberty to consider the statements on their face as evidence of not only a conspiracy, but that Mr. Carroll was part of the conspiracy. There was no independent evidence that Mr. Carroll was part of the conspiracy, other than some mere association which really was not in dispute because they knew each other and Mr. Carroll worked for Mr. Norman and his family. So our position was certainly by the end of the trial and by the time that the court was making its final bell findings, the court could not point and the government still cannot point to any independent evidence that Carroll himself was part of this conspiracy. And that is an element. It's not just that a conspiracy existed, that Mr. Norman had a conspiracy with some third party. Didn't Hill testify that Carroll met with the defendant to plan things just a few days before the murder? Correct. He testified... Is that a connection? It is a connection, but there's no independent evidence. That's the hearsay and that's all there is. And the hearsay statements alone cannot demonstrate that Mr. Carroll was a participant in the object of the conspiracy. Again, as opposed to some unwitting dupe or a patsy in the process, there has to be some independent evidence other than this unreliable hearsay statement that he actually was part of this conspiracy, a member of this conspiracy. And our position is that the record just is devoid of any of that independent evidence which is problematic for its admission, particularly since, again, this really is the most direct evidence of an intent to kill on the part of Mr. Norman. It is highly damning evidence. It's really a game changer, frankly. And then you have the additional problem, which is then Mr. Carroll is not available to Mr. Norman because Mr. Norman makes it very clear this testimony that Mr. Hill has provided is not trustworthy, is not believable, and really we have no reason to believe it. If you look at the statements that Mr. Carroll made to the FBI during two lengthy interviews previously, he has consistently maintained that I had no idea about this, I was not involved with it, I never made these statements to Mr. Hill. Yeah, I picked up Tim from the airport many times. And we have to assume the U.S. Attorney's Office and the FBI credited that. They didn't charge him. They didn't even call him to the grand jury. So with that in mind, the fact that Mr. Norman did not have the ability to even call Mr. Carroll to say, hey, I didn't make those statements, put him in a rather large predicament to present evidence to defend against what is ultimately hearsay, not reliable evidence, because there's just really no reason to believe that Carroll was part of this conspiracy. And it's pretty clear that the government did not really take the position he was part of the conspiracy until they had an interest in keeping him off the stand. And I'm not saying that they benefited from his Fifth Amendment invocations, which were invoked in a very broad manner. And I'm not suggesting that his Fifth Amendment invocations should somehow be trumped by Mr. Norman's Sixth Amendment rights. But there has to be a particularized inquiry that was not conducted. There had to be some real meaningful review of why is he invoking the Fifth now? And did he waive it? Did he sit down for two interviews with the FBI and answer questions? Gave his phone? Does it matter that all those interviews are not under oath, counsel? Well, I think the argument would be stronger if they were under oath. So I will concede that the fact that they were not under oath, it makes the argument slightly weaker. But I do think that when someone voluntarily sits for an FBI interview for hours upon hours, without counsel notably, comes back a second time, gives over his phone, and says, go ahead, look through my entire phone, answers every single question, that seems to be a waiver. And frankly, it suggests that he is affirmatively waiving his Fifth Amendment rights. But of course, if he had testified before the grand jury, which again, he didn't, and I think we can speculate why, because they did not find that his testimony was helpful. The government didn't. But if he had, yes, I think it would be a stronger argument. But I don't think it changes the overall calculus that he did in fact waive his rights. And that doesn't mean he waived his right to anything. He waived his right to the subject matters about which he was questioned. And if the court was not going to permit Mr. Norman to present his testimony, then it absolutely should not have been that Mr. Carroll's statements to the dubious Mr. Travell Hill should have come in. That maybe would have been the solution. Let's not let that hearsay in, because he's not going to get an opportunity to put on evidence to refute it. Because make no doubt about it, there's no doubt that Mr. Norman and his counsel believed that if they were able to present Mr. Carroll's testimony, he would have said, I never made those statements to Travell Hill. And that is what he told the FBI. I don't know if I'm... You are into your rebuttal. Okay, I am going to... Because the 20 is the total time. It includes the rebuttal time. Understood. I saw that yellow light. Your Honor, I think what I will do is reserve at this point and let my opponent... You certainly may. Thank you. Thank you. Ms. Danis. Good morning. May it please the Court. I want to pick up where counsel left off, starting first with the independent evidence of Mr. Carroll's involvement in this conspiracy. Not only do we have the testimony of Travell Hill that he met with Christopher Carroll in the days and weeks leading up to the murder and had this conversation. We also have Mr. Hill's testimony that on the day of the murder itself, he met with the defendant, Tim Norman, and Tim Norman conveyed to him, have you talked to white boy Chris? And immediately, without including any of the hearsay, that fact. And that's a meeting, by the way, which Mr. Norman confirmed occurred during his testimony. So after that meeting, immediately after, Mr. Hill goes and purchases a firearm and it is his intent to go seek out and kill Andre Montgomery. That is independent evidence of Carroll's participation in this conspiracy that doesn't consider the hearsay itself. And while the Court can consider the hearsay statements themselves, they cannot provide the sole basis, but the independent evidence can be purely circumstantial under Eighth Circuit case law. There was further evidence of Mr. Carroll's participation in the conspiracy when Tim Norman submitted text messages to him saying, I got the pictures, referring to pictures of Andre Montgomery from Ed Chandler, another participant, another uncharged co-conspirator. He was acknowledging that Andre was located in St. Louis. He had located Andre and could proceed. Again, we must establish Mr. Carroll's participation beyond a preponderance of the evidence. That is the standard we're talking about here. And this is all the evidence that was before the Court when they deemed that Mr. Carroll had participated in this conspiracy and thus those statements were admissible under 801 D2E. I want to go into the Fifth Amendment issue because counsel suggested that perhaps the appropriate remedy would have been to strike Mr. Carroll's hearsay statements when Mr. Carroll appeared and invoked the Fifth Amendment. There was no legal basis to strike these statements. In terms of chronology, the Court had heard all of this evidence. They had determined that Carroll was a co-conspirator and that those statements were admissible. And Mr. Carroll did not appear to invoke the Fifth Amendment until after those findings had been made. So in terms of chronology, it's very important. I also want to point to document number 389 in the Court's record because while there is no Eighth Circuit case law directly on point with regard to invoking the Fifth Amendment and whether someone can be called for the purpose of invoking the Fifth Amendment, there is Tenth Circuit case law that the Court cited in refusing to compel Wally Yagnum's testimony. And that case law suggests that while it's the defendant's right to present a defense, that right is not absolute. It is subject to other considerations. And in this case, Mr. Carroll's Fifth Amendment. Has this Court cited the Tenth Circuit law or the Tenth Circuit cases? Has this Court... Yeah, the Eighth Circuit cited the Tenth Circuit. I have not. I'm not familiar with that, Your Honor. There's also Second Circuit and Fifth Circuit case laws. Have we cited any of those circuits? I don't know, Judge. Okay. I'm not familiar. But those are highly persuasive cases because they are directly on point and refer to someone's invocation of the Fifth Amendment rights, even in the face of having submitted to previous interviews. The Court held in those cases, again, and it's the Rivas-Messias case particularly that the Court references and the District Court referenced in document 389. And in that case, they held that submitting to previous interviews does not constitute a waiver of one's Fifth Amendment rights. Those Fifth Amendment rights can be exercised. They're specific to a proceeding. And interviews that exist with the FBI do not constitute parts of that proceeding. What if the interviews are under oath? I think it's a completely different analysis of those interviews. Is there a case law under oath? There is case law under oath that has been cited in the briefing. I mean Eighth Circuit case law. Eighth Circuit case law regarding previous statements under oath. In that case, I think it's more important to conduct the particularized inquiry of whether or not someone has validly waived those Fifth Amendment rights and the scope of those Fifth Amendment rights. Counsel wants to suggest that Mr. Carroll's invocation of the Fifth Amendment was far too broad. But again, the Court cannot ask questions that would provide any link, inquire further that would provide any link in the chain to incriminate himself. And in this case, though not required by Eighth Circuit law, required by other circuits, did inquire as to a more particularized finding with Mr. Carroll. When they asked, are you saying with regard to Mr. Hill, Robby Montgomery, Ed Chandler, with regard to these particular individuals, you're not going to answer any questions? And he continued to invoke his Fifth Amendment rights. Those statements were adequately admitted under 801 D2E, and Mr. Carroll's invocation of the Fifth Amendment should not eviscerate the District Court's finding under that evidentiary ruling. I want to go next to Andre Montgomery's text messages, because I think these text messages have been made to sound like they are a far greater portion of the evidence than they ever were. They were admitted on day one of the trial. They constituted 25 lines of testimony from Special Agent Christopher Faber. They were not referenced again until two lines of transcript in closing. This was in the face of overwhelming independent evidence that Mr. Norman had people looking for Andre Montgomery. It was part of their case-in-chief, in fact. They called a private investigator who testified that he had people looking for Andre Montgomery. And while we focus a lot on the temporal proximity, these statements with regard to the time of the murder itself. The murder was March 14th of 2016. This conspiracy began, and was charged in the indictment, beginning for the FACTS, Incorporated began when Mr. Norman started with Mr. Yagnum submitting these fraudulent life insurance policies. That began in October of 2014, and it continued well into 2018 in his continued attempts to collect on that life insurance policy. These text messages, Andre staying away from St. Louis, regardless of why he's staying away from St. Louis, it doesn't matter if it's for a burglary or for the life insurance policies. The fact that he is staying away from Mr. Norman is completely relevant to why Mr. Norman needed assistance in locating Andre. There was significant independent evidence produced of Mr. Norman's seeking Andre Montgomery out. Given that it constituted such a small portion of this trial, and it is not the only evidence of intent. There was evidence presented two days after the homicide. Tim Norman, through Daryl Howard, arranged for a payment of $5,000 to Travell Hill after his nephew had been murdered. The task had been completed. I don't know if there's any more evidence of intent than paying the shooter and murderer of your nephew. So it was not the only evidence of intent that this be committed. It constituted such a small portion of the evidence in this case, and there is no basis for overturning Mr. Norman's conviction based on the admission of these hearsay statements. We are asking this. It is a slight influence. If you're just arguing prejudice, it is a slight influence test, right? I would say if it is slight, Your Honor, it certainly does not overwhelm the relevance. The prejudice, any prejudice, certainly does not overwhelm that probative value that those text messages provide. They make Terica Ellis's- It has to be more than a slight. I said it kind of roughly. Correct. I'm looking at our cases. More than a slight influence. Correct. One of the ways that we analyze whether something is a slight influence or it has greater influence is we look at how does it come in, what are the arguments that came before it's admitted, what's laid in, what are the purposes, what's the court's initial ruling, and then we look at, well, how does it fit in at the end of the case, and usually we hang big red flags on things that get argued in the closing argument, even in sort of kind of passing and glancing ways. So you tell me why we shouldn't put some emphasis on the closing argument that did, in fact, mention this text. I will say in the context of that line of transcripts that I mentioned in closing, I was also referring to a text message from Travell Hill to Tim Norman where he was referring to an Instagram post, and Travell Hill told Tim Norman during that time period, hey, Andre accepted the friend request, further evidence that he had someone looking for him. So it was argued very closely to other independent evidence that he had people looking for him. I will also note that there was no objection raised at trial to the statement in closing, and it's been, the appellant has not raised that argument and submitted that it should be. Yeah, and I'm not saying that we're looking at that as sort of a plain error basis reversal. What I'm really saying is that if we look at whether it's more than a slight influence, we want to look at, well, how did it fit together in the government's theory of the case? And I think you've already explained how the argument really had more to do with other texts than this particular text. That's correct. And that's what I would submit in the other independent evidence that people, again, including the defendant's case in chief itself, that people were looking for Andre Montgomery. And that's why he was presumably, in his state of mind, why he had conveyed that he was staying away from St. Louis. I know that appellant mentioned that they are going to address the jury instructions. I anticipate they may do so in their rebuttal. No, they, no. Oh, I'm sorry. If you mention an opening, they may not. I'm sorry. No, that was in the overview, but that often happens. Okay, well, thank you, Judge. Sometimes I get going and I lose track. No, no, no. Proceed. I appreciate it. But, of course, if you wish to discuss them, you may bring them up, and then we'll hear from the other side. Just very briefly, Your Honor, these, the, they were jointly submitted. And that's, that, the record overwhelmingly supports that these, these instructions were jointly submitted by the parties. The court made it a very clear record that they were jointly submitted instructions. And as such, they are not subject to review by this court. Lastly, I will, we discussed, I'm sorry, let me find my bearings for a moment. It's your time. Go ahead. Your Honor, unless the court has further questions with regard to the, Chris Carroll's hearsay statements, the hearsay itself that was submitted pursuant to 8033, I would submit that there is no legal basis on any of the seven points raised by the appellant in which to overturn Mr. Norman's conviction. And we would ask this court to affirm the court's rulings in this matter. Thank you, Ms. Dennis. Thank you. Ms. Bonge. Thank you, Your Honor. Just briefly, I think counsel brought us into the same problem that we had with Mr. Carroll's testimony with Mr. Yagnum's testimony, which of course is a much stronger argument because he actually pled guilty, he made statements under oath, and then Mr. Norman was still prohibited from presenting that testimony because Yagnum, well, he even refused to show up for counsel, said he was going to invoke his Fifth Amendment right, no particularized inquiry whatsoever. And his testimony was highly relevant and highly helpful to Mr. Norman because what he expected him to testify to and what I don't think anyone could arguably dispute he would have testified to is that Mr. Montgomery knew about these insurance policies. And that's not just relevant to the wire fraud counts, it's highly relevant to the government's theory of motive. And that was important about whether or not there was a motive to kill Mr. Montgomery because to collect on these insurance policies. Mr. Montgomery knew about the insurance policies, it's equally plausible that maybe Mr. Montgomery and Mr. Norman and Mr. Yagnum were all part of some scheme related to some insurance policies unrelated to this other incident. I would also point out that it is not in dispute that Mr. Norman was looking for Mr. Montgomery. I mean, counsel is correct, it was part of the defense. But it does matter what he was looking for him for. Is it looking to kill him or looking for him for some other purpose? And that's the part that we're just kind of glossing over. So I think the court needs to remember that it was hotly debated that Mr. Norman was looking for Mr. Montgomery to kill him. And even the other co-conspirators said, we don't know why he was looking for him. We understood because he wanted to get his stuff back. And just quickly circling back to the hearsay statements, the 25 lines, you know, 25 lines can be pretty damning in the context of a trial. It's not the quantity, it's the quality. And these were quality statements. This is literally, a jury is going to be incredibly impacted by statements from somebody, again, from the grave saying, Tim is out to get me, Tim has people looking for me. And the fact that they did go back to it in closing argument to say, and he was right. Sometimes the most powerful evidence takes very few words. And I think as trial lawyers, we know that. And so there isn't much more to be said. That speaks for itself. And that's why it was so impactful. And it did go to intent in a way that some of the other evidence did not. In the same way, the Chris Carroll hearsay statements. I want to point out that there was not independent evidence. There was, and I think the court, I urge the court to go back and look at the record. What Mr. Hill testifies to is that he has this meeting with Mr. Norman. He vehemently denies that he ever discusses with Norman any murder or anything of that nature. It's very confusing testimony. And all that says is, did you talk to white boy Chris? That's it. That is all that was said from Mr. Norman to Mr. Hill. That is not corroboration that Mr. Carroll was part of a conspiracy to murder for collecting on insurance proceeds. I'll even go so far to say, maybe it was some type of comment about a conspiracy to look for him to beat him up or something as it relates to the burglary. I mean, it could mean anything. It just is not independent evidence that Chris Carroll was in on the object of the conspiracy to kill. We're losing that piece of it. They don't get to just say, clearly they're in on some conspiracy. It has to be the object of the conspiracy which was a murder for hire plot. And that is what they failed to do. And lastly, since counsel did open the door on the jury instruction issue, I'll use my last 50 seconds to say this. The record should have been better preserved. There's no doubt about it. But what counsel did do in his motion for a new trial is he raised it as an error. So it clearly was objected to. I would agree that I would like to have seen it more preserved on the record. That being said, still plain error looking at Instruction 22. It completely excised out some of the most important things about a jury instruction that advises the jury on how to analyze and examine cooperator testimony, co-defendant testimony, including the government's role in it, and a witness's desire to make the government happy. That is part of the pattern jury instructions. The pattern in jury instruction should have been admitted. And this curated instruction that was offered didn't do the job. I have two seconds left. I thank the court for its time. Thank you both counsel for the arguments. Case number 23-1473 is submitted for decision by the court. Ms. Henderson.